UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------------------------------x
MICHAEL SHUFORD,

       Petitioner,

-against-

W.E. PHILLIPS, Superintendent
of Greenhaven Correctional Facility,

       Respondent.
----------------------------------------------------------x

**MEMORANDUM AND ORDER**

04-CV-1668 (ENV)

FILED
IN CLERK'S OFFICE
U.S. DISTRICT COURT E.D.N.Y.
★ SEP 0 4 2008
P.M.
TIME A.M.

VITALIANO, D.J.

  Michael Shuford petitions this Court *pro se* for a writ of habeas corpus pursuant to 28 U.S.C. § 2254. Shuford is currently serving concurrent terms of ten and a half years for manslaughter and one year for each of three weapons possession charges upon a judgment of conviction entered in Supreme Court, Kings County. Shuford argues that the trial court denied him due process in refusing to suppress identification testimony that he contends was the product of an unduly suggestive lineup, and also joins in any arguments made by his co-defendants.[1] For the reasons set forth below, the writ is denied and the petition dismissed.

## FACTUAL AND PROCEDURAL BACKGROUND

### I. Suppression Hearing

  Prior to trial, Supreme Court held an evidentiary hearing, pursuant to Wade v. United States, 388 U.S. 218 (1967), to determine whether the identification of Shuford at a post-arrest lineup was flawed by unduly suggestive pretrial identification procedures arranged by the police.

---

[1] Only one of Shuford's two co-defendants, Mario Medulla, has filed a petition for a writ of habeas corpus with any judge of this Court. See Medulla v. Annets, No. 04-CV-4335 (E.D.N.Y. dismissed May 12, 2005).



1

At the hearing, Detective Peter McMahon of the Brooklyn South Homicide Squad testified to the following sequence of events. On May 13, 2000, McMahon and Detective James Normile of the 60th Precinct Detective Squad were assigned to investigate the homicide of Cliff DeFazio, which had occurred that day in the vicinity of Brighton Fourth Street and Brighton Fourth Terrace. The detectives interviewed witnesses at the scene and learned that three men had driven there earlier in a white car and had beaten DeFazio with sticks taken from the trunk of the car. As a result of the investigation, Michael Shuford, Brian Calise, and Mario Medulla were identified as suspects.

The next day, May 14, detectives arrested Shuford and brought him to the 60th Precinct. A lineup was arranged consisting of Shuford and five fillers selected by other detectives. McMahon allowed Shuford to choose his own position and the fillers' positions. Shuford placed himself in position number six. McMahon documented the appearance of the lineup prior to each witness's viewing by taking Polaroid photographs. According to notes taken at the time of the lineup, Shuford was 20 years old, six feet tall, and weighed 170 pounds. The five fillers had the following characteristics:

> Filler one: 24 years old, 5'10" tall, 170 pounds.
> Filler two: 27 years old, 5'11" tall, 190 pounds.
> Filler three: 28 years old, 6'1" tall, 180 pounds.
> Filler four: 24 years old, 5'10" tall, 175 pounds.
> Filler five: 28 years old, 5'9" tall, 165 pounds.

Because Shuford had shorter hair than some of the fillers, McMahon further testified at the hearing that he required him and all the fillers to wear head coverings to obscure their hairstyles. Even though the coverings were transparent at close range, McMahon testified that the viewing witnesses were unable to see through them and discern details like hair length.

The lineup was viewed separately by three eyewitnesses to the crime: Robert Kowalik, Mary Sem, and Anatoly Krinitskiy.[2] According to McMahon, the witnesses did not see either Shuford or the fillers between the time of the homicide and the time they viewed the lineup. McMahon explained to each witness before viewing the lineup that he would ask three questions: whether the witness recognized anyone; which number person in the lineup the witness recognized; and from where the witness recognized that person. After having separately viewed the lineup, each witness was placed in a separate room so as to be unable to come into contact with the witnesses who had yet to view the lineup.

Kowalik viewed the lineup first. Kowalik identified number six as one of the people who had been in the white car and whom he had seen assault DeFazio. Sem viewed the lineup next and said that she recognized number six from the fight. Krinitskiy viewed the lineup last, and stated that the person in position number six looked like one of the people he saw in the fight.

McMahon testified that, at some point, he asked one of the witnesses if he or she wanted the individuals in the lineup to separately approach the viewing window, and that the witness replied yes. Each of the individuals came up to the window separately, approximately four feet from the witness. McMahon did not make a written record of which witness requested that the individuals come forward and he did not recall which one it was, though he thought it was either Sem or Krinitskiy.

Shuford also testified at the <u>Wade</u> hearing, claiming that during the lineup he told the detectives that none of the fillers looked like him or were close to his age, and that the detectives responded it was the best they could do at that time of night. Shuford also testified that he was instructed to approach the window three times, once for each witness.

---

[2] Only Kowalik and Krinitskiy testified at the trial.

Following the hearing, Supreme Court denied Shuford's motion to suppress the identification testimony. After examining the photographs of the lineup, which it characterized as "excellent photographs . . . whose quality is superior to that normally seen at this kind of hearing," the court found the photographs established that the head covers were translucent "but did not permit the viewer to see specifically the kind of hairstyle worn by the participants." The court noted that all of the men in the lineup were of the same skin tone and the same "ambiguous ethnicity." Further, although Shuford was the youngest in the lineup, the court found that he did not stand out because of his age.

The court did, however, note that there was a disputed issue of fact as to whether the individuals in the lineup approached only once or all three times, but found further that "whoever viewed the lineup did not on the basis of the present record see a unique hairstyle of the defendant." The court specifically found the photographs "clearly show that that would have been unlikely, these photographs showing the nature of the hair covering and what can be seen underneath the hair covering." The court observed that the lineup "was not perfect, but a perfect lineup is not required." The court then ruled that since none of the identifying witnesses had testified at the hearing, the court's determination was without prejudice to the parties developing additional facts about the lineup at trial, and, if they did, that the court would base an independent source ruling, if necessary, upon the testimony elicited at trial.[3]

## II. <u>Evidence at Trial</u>

Upon waiver of a jury trial by all defendants, the court held a bench trial commencing February 21, 2001.

---

[3] Supreme Court also held a hearing pursuant to <u>Dunaway v. New York</u>, 442 U.S. 200 (1979), during the trial and denied Shuford's motion to suppress his lineup identifications on the ground that they were the product of an unlawful arrest without probable cause. Shuford has not raised any claim regarding his arrest in his § 2254 petition.

4

### a. The Prosecution's Case

Kowalik and Michelle Petrano both testified that on May 12, 2000, in the vicinity of West 15th Street and Mermaid Avenue, a quarrel erupted between them in which Petrano told Kowalik he looked like a "crackhead". Kowalik countered by telling Petrano that her breasts were hanging out and she should wear a bra (and, according to Petrano, grabbed her chest), then poured water on her. Petrano testified further that, later in the day, she called her boyfriend, Michael Rizzo, who was incarcerated, to tell him about the exchange. Rizzo told Petrano to contact his friend, Shuford. Petrano then called Shuford and left a message; Shuford did not return it. Petrano also testified that on the following day, the day DeFazio was attacked, she told Mario Medulla, whom she also knew through Rizzo, about the incident. Medulla said he would go to Kowalik's house to speak to him.

Kowalik also testified about the events of May 13th. He said Shuford (whom he knew previously through Petrano and Petrano's boyfriend as "Mike") and two other men showed up that afternoon at his home on Brighton Fourth Street in a white, four-door automobile. According to Kowalik, his mother and two friends, Mary Sem and Cliff DeFazio, were at home with him when the men arrived. Sem and Kowalik went outside. Shuford got out of the car and asked to speak to Kowalik privately. As they approached the house, Shuford "rushed" Kowalik, but Kowalik ran inside. The three men then drove away, but returned a few minutes later, stopping again in front of Kowalik's home. Upon their return, DeFazio came out of the house. DeFazio told the men that he had been stabbed and shot, and he would take on all three of them. DeFazio's yelling aroused the interest of Krinitskiy, who observed the situation from his second-floor window at One Brighton Fourth Terrace. The three men then drove a short distance and stopped on Brighton Fourth Terrace (but temporarily out of Krinitskiy's view).

5

Kowalik acknowledged in his testimony that there were trees and cars between his vantage point and the white car, but that they did not obstruct his view. As Kowalik watched, DeFazio advanced towards the car. The driver then got out and spoke to him. Shuford and the other passenger also got out of the car and took sticks or bats out of the trunk. DeFazio began to retreat and run away from the car, but the three men overtook him. They hit DeFazio with the sticks until he fell to the ground. Krinitskiy, who had left his apartment by this time, also testified that he saw three men surrounding DeFazio, hitting him with sticks or bats. Krinitskiy stated that one of the men, who had darker skin than the others and who was carrying a stick or bat with a ball on the end, looked like Shuford, although he could not positively identify him in court. Another witness, construction worker Vincent Dolan, testified that he also saw three "white guys" surrounding DeFazio and that they were hitting DeFazio on the chest with sticks or small bats. Dolan could not, however, see the men's faces.

According to all three eyewitnesses who testified at trial, the three men then got into the car and drove away, swerving to avoid DeFazio on the ground. Dolan noticed the license plate number and reported it to the police. The car was later shown to belong to co-defendant Medulla's girlfriend. Despite attempts to revive him, DeFazio died as a result of the beating.[4]

After the attack, Kowalik, according to his testimony, called Petrano's brother to complain that Petrano had sent people to his house. More significantly, Kowalik and Krinitskiy also testified that they each provided the police with fresh descriptions of the assailants.[5] The next day, May 14, Kowalik and Krinitskiy each viewed a lineup of six people. Only Kowalik

---

[4] The medical examiner determined that the cause of DeFazio's death was blunt impact to the torso.

[5] McMahon testified that Kowalik described Shuford as a "Black or Hispanic" male, between 20 and 25 years old. McMahon further testified that this description corresponded to that of other witnesses, who described one of the assailants as having darker skin than the other two.

6

would make a definite identification. At trial, Kowalik identified Shuford as "Mike," the person he spoke to shortly before the beating and one of the men he watched attack DeFazio.

Additional evidence was elicited regarding the pre-trial lineup for purposes of Shuford's renewed Wade motion and/or as trial evidence if the renewed motion were to be denied. In relevant part, Kowalik testified that he did ask a detective to have the individuals step forward to the viewing window and that he identified Shuford only after the participants came forward. Kowalik testified further that he could discern the hair length of individual lineup participants when they came up to the window, and that two of the six participants had long hair and four (including Shuford) had short hair. Kowalik admitted that seeing Shuford's hair length helped him make a decision. McMahon testified that he did not recall that Kowalik asked participants to approach the window.

### b. The Defense Case

Shuford called no witnesses at trial. Co-defendant Medulla called a private investigator, Gilbert Powell, who claimed that he had interviewed Krinitskiy about seven months after the homicide. Powell testified that Krinitskiy told him that he could not identify any of the men who attacked DeFazio. (At least with respect to Shuford, the prosecution never suggested otherwise.)

At summation, Shuford argued that there was no reliable identification of him. He pointed to the lack of any positive identification by Krinitskiy and challenged the credibility of Kowalik and Dolan (each had a criminal record). Shuford's counsel also argued that, even if Shuford was present during the attack on DeFazio, there was no intent to kill or to cause him serious physical injury.

### c. The Verdict

Supreme Court found Shuford guilty of manslaughter in the first degree (N.Y. Penal Law §125.20[1]) and three counts of criminal possession of a weapon in the fourth degree (N.Y. Penal Law §265.01[2]). As to the evidence supporting Shuford's identity as one of the assailants, the court explicitly found that, out of the three, Shuford was the defendant against whom there was the least identification evidence. Indeed, the court found that Krinitskiy's testimony, even though it offered some supporting evidence of Shuford's guilt, was not enough to convict on its own. Nonetheless, Kowalik's identification of Shuford at trial and his testimony that he had identified him at a lineup established, the court held, Shuford's identity as one of the assailants beyond a reasonable doubt. The court recounted how Kowalik had an "excellent opportunity" to view Shuford when he spoke to him in front of the house in broad daylight and that Kowalik knew Shuford through Petrano and her boyfriend. That was further confirmed by Kowalik's call to Petrano's brother immediately after the attack, which virtually contemporaneously connected Petrano to the assailants. Thus, the court also found explicitly Kowalik knew right away that one of the three assailants was Shuford, that is, long before any alleged suggestiveness in the lineup procedure.

As to the lineup itself, Supreme Court adhered to its pretrial ruling that it was not unduly suggestive because, although Kowalik noticed two of the participants in the lineup had long hair when they came to the viewing window, the other four had short hair, plus controlling law had set no minimum number of people required for a constitutionally valid lineup. Further, the court said, Kowalik had already recognized Shuford as one of the men he saw beating DeFazio pre-lineup. Thus, the court found that the identification had an independent source – first, Kowalik's

8

excellent opportunity to see Shuford at the scene, and, second, his previous knowledge of Shuford through Petrano and Rizzo.

Supreme Court concluded that the evidence at trial established beyond a reasonable doubt that Shuford was the assailant who had the bat or stick with a ball at the end; that Shuford and the other defendants had an intent at least to cause serious physical injury; that all three men struck DeFazio with sticks; and that the beating was the sole cause of DeFazio's death, all of which satisfied the elements of first degree manslaughter and three counts of fourth degree weapons possession.[6] The court sentenced Shuford to ten and a half years in state prison and three years post-release supervision for the manslaughter count and one year, each, for the weapons possession counts, all to run concurrently.

### III. Post-Conviction History

Shuford timely appealed to the Appellate Division, Second Department, see People v. Shuford, 303 A.D.2d 770, 757 N.Y.S.2d 443 (2d Dep't 2003), arguing that the trial court denied him due process by improperly determining that the lineup procedure was not unduly suggestive, and he joined, to the extent applicable, in any arguments made by his co-defendants.[7] On March

---

[6] Under New York law, Manslaughter in the First Degree is defined as when a person, "[w]ith intent to cause serious physical injury to another person, he causes the death of such person or of a third person." N.Y. Penal Law § 125.20[1]. Criminal Possession of a Weapon in the Fourth Degree is defined as when a person "possesses any dagger, dangerous knife, dirk, razor, stiletto, imitation pistol, or any other dangerous or deadly instrument or weapon with intent to use the same unlawfully against another." N.Y. Penal Law § 265.01[2].

[7] Shuford's co-defendant Medulla also filed an appeal to the Appellate Division, Second Department, in which he claimed (1) that the verdict was not supported by the weight of the evidence; (2) that the evidence was insufficient; (3) that the trial court's comments regarding his efforts to plead guilty reflected bias and required reversal; and (4) that the sentence imposed on him was excessive. See Medulla, *supra* note 1 at 2 (dismissal of § 2254 opinion summarizing appellate brief). On March 31, 2003, the same day as it affirmed Shuford's conviction, the Appellate Division affirmed Medulla's conviction. People v. Medulla, 303 A.D.2d 767, 757 N.Y.S.2d 441 (2d Dep't 2003). The Appellate Division held that Medulla's legal insufficiency claims were unpreserved for appellate review, and, in any event, that the evidence was legally

31, 2003, the Appellate Division affirmed the judgment of the trial court, holding that the hearing court properly determined that the lineup procedure was not unduly suggestive. Id. The Second Department also held that Shuford's legal insufficiency claims were unpreserved for appellate review and that, in any event, viewing the evidence in the light most favorable to the prosecution, it was legally sufficient to establish Shuford's guilt beyond a reasonable doubt. Id. at 771. According great weight to the factual findings of the trial court, the Appellate Division was satisfied that the verdict was not against the weight of the evidence and noted that resolutions of credibility were questions to be determined by the trier of fact. Id. The court also held that the sentence was not excessive and that Shuford's remaining contentions were either "unpreserved for appellate review or without merit." Id.

On April 28, 2003, Shuford sought leave to appeal to the New York Court of Appeals. On July 11, 2003, the Court of Appeals denied Shuford's application for leave to appeal. People v. Shuford, 100 N.Y.2d 587, 764 N.Y.S.2d 398 (2003). Nine months later, Shuford filed the instant petition.

## DISCUSSION

### I. AEDPA Standard of Review

Under the Antiterrorism and Effective Death Penalty Act, Pub. L. No. 104-132, 110 Stat. 1214, 1219 (1996) ("AEDPA"), a writ of habeas corpus shall not issue with respect to any claim that was adjudicated on the merits in state court unless the state court's adjudication (1) was

---

sufficient to establish Medulla's guilt beyond a reasonable doubt; the verdict was not against the weight of the evidence; the sentence imposed was not excessive; and Medulla's remaining contentions were either "unpreserved for appellate review or without merit." Id. at 768. Shuford's co-defendant Calise also filed an appeal to the Appellate Division in which he claimed that the trial court improperly refused to suppress the identification testimony as unduly suggestive. People v. Calise, 303 A.D.2d 761, 757 N.Y.S.2d 453 (2d Dep't 2003). On March 31, 2003, the Appellate Division also affirmed his conviction. Id.

contrary to or involved an unreasonable application of clearly established federal law, as determined by the United States Supreme Court; or (2) was based on an unreasonable determination of the facts in light of the evidence presented. 28 U.S.C. § 2254(d); Williams v. Taylor, 529 U.S. 362, 412-13 (2000).

In Williams, the Supreme Court delineated an analytical framework to guide review of habeas claims with respect to each clause of § 2254(d). As to the "contrary to" clause, a writ may issue if the state court decision "contradicts the governing law set forth in [Supreme Court] cases" or arrives at a different conclusion from the Supreme Court on "materially indistinguishable" facts. Williams, 529 U.S. at 405-06. As to the "unreasonable application" clause, a writ may issue if the state court "identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." Id. at 413. The "unreasonable application" inquiry, however, is limited, and the habeas court may only issue a writ where the state court's application of Supreme Court precedent was "objectively unreasonable." Id. at 409. "Some increment of incorrectness beyond error is required" for a decision to be considered objectively unreasonable, though the increment need not be great. Francis S. v. Stone, 221 F.3d 100, 111 (2d Cir. 2000). Further, under AEDPA, factual determinations of a state court are presumed to be correct. 28 U.S.C. § 2254(e)(1). These findings are only "unreasonable" when a petitioner rebuts the presumption of correctness "by clear and convincing evidence." Id.

## II. Claims Based Upon the Alleged Unduly Suggestive Lineup

The Due Process Clause protects a criminal defendant from the admission of identification testimony that is both inherently unreliable and obtained through impermissibly suggestive procedures. Manson v. Brathwaite, 432 U.S. 98, 114 (1977) ("[R]eliability is the

11

linchpin in determining the admissibility of identification testimony"); Watkins v. Sowders, 449 U.S. 341, 347 (1981); Raheem v. Kelly, 257 F.3d 122, 133 (2d Cir. 2001); Jarrett v. Headley, 802 F.2d 34, 42 (2d Cir. 1986). The standard for admissibility of such evidence has been clearly established by the Supreme Court's decisions in Brathwaite, 432 U.S. at 114, Neil v. Biggers, 409 U.S. 188, 198 (1972), and Stovall v. Denno, 388 U.S. 293, 302 (1967). In determining whether the improper introduction of identification evidence violates due process, a court must consider: (i) whether the pretrial identification procedures were unnecessarily suggestive; and if so (ii) whether the identification was nonetheless independently reliable. Raheem, 257 F.3d at 133. Even if the court concludes that the pretrial identification procedures were unduly suggestive and that the identification was unreliable, the error is still subject to a harmless error analysis. Wray v. Johnson, 202 F.3d 515, 525 (2d Cir. 2000); Raheem, 257 F.3d at 142.

### a. Suggestiveness

Shuford claims that the trial court denied him due process in refusing to suppress his identification at a lineup in which the police used fillers who were older and some with visibly longer hair. Concisely, he argues the lineup was unduly suggestive. The argument falls flat.

There is, of course, no requirement that all of the individuals "be uniform with respect to a given characteristic." Jarrett, 802 F.2d at 41. Rather, "[w]hen the appearance of participants in a lineup is not uniform with respect to a given characteristic, the principal question in determining suggestiveness is whether the appearance of the accused, *matching descriptions given by the witness,* so stood out from all of the others . . . as to suggest to an identifying witness that that person was more likely to be the culprit." United States v. Wong, 40 F.3d 1347, 1359-60 (2d. Cir. 1994) (internal citations, alterations, and quotation marks omitted, emphasis original); see also Raheem, 257 F.3d at 134 (question is whether the suspect "meets the

12

description of the perpetrator previously given by the witness and the other lineup participants obviously do not."). Here, the evidence at the Wade hearing and offered at trial demonstrated that Shuford did not stand out in the lineup because of his age or hair length. The trial court examined the photographs of the lineup and considered them to be of above-average quality, and also assessed Shuford's appearance in court. The court noted that the participants were of the same skin tone and ambiguous ethnicity as Shuford, and that, although he was the youngest in the lineup, Shuford did not appear in the photos to be younger than the fillers. Further, although Kowalik had previously described Shuford as having "short hair" and testified that seeing Shuford's hair through the cap helped him make his decision, Kowalik testified that at least three other people in the lineup similarly had short hair. Thus, four of the six people in the lineup all shared the feature that Shuford alleges made him stand out – a fact that strongly weakens any inference of undue suggestion. Cf. United States ex rel. Cannon v. Montayne, 486 F.2d 263, 268 (2d Cir. 1973) (noting that if "one or two" other people in a five-person lineup had also worn a shirt of the color described by witnesses, which only the defendant wore, "the inference [of undue suggestion] would weaken very considerably."). Based upon this record, the Court agrees with the trial court that the lineup, though not perfect, was not unduly suggestive.

### b. Independent Reliability

In any event, even if the lineup was unduly suggestive, the Court finds that the identification of Shuford by Kowalik was, without doubt, independently reliable.

Independent reliability is determined by applying a five-part, totality-of-the-circumstances test, which takes into account: (i) the witness's opportunity to view the criminal at the time of the crime; (ii) the witness's degree of attention; (iii) the accuracy of the witness's prior description of the criminal; (iv) the level of certainty demonstrated by the witness; and (v)

13

the time between the crime and the identification. Biggers, 409 U.S. at 199-200; Brathwaite, 432 U.S. at 114. These five factors must be weighed against the "corruptive effect" of the suggestive confrontation. Brathwaite, 432 U.S. at 114. As noted by the trial court, Kowalik had the opportunity to view Shuford near Kowalik's residence twice – first, when Shuford got out of the car, asked to speak with and then "rushed" Kowalik himself, and then again during the beating of DeFazio. Kowalik recognized Michael Shuford as "Mike," someone he already knew through Petrano and Rizzo. He later described Shuford accurately to the interviewing police officer after the attack. Indeed, as the state court noted, after the attack, Kowalik called Petrano's brother angry that Petrano had sent her friends over to his house – thus, bolstering Kowalik's identification of Shuford as the Mike involved in the assault *before* the alleged suggestive lineup. Finally, at the lineup (which was conducted the day after the attack), Kowalik identified Shuford with complete certainty. Considering all of these factors, even if the lineup was unduly suggestive, Kowalik's identification was independently reliable.

### III. Legal Insufficiency and Judicial Bias Claims

Shuford also joins in any arguments made by his co-defendant Mario Medulla.[8] Construing his petition liberally, the Court therefore assumes that Shuford argues (1) that the evidence presented was legally insufficient to support his manslaughter and weapons convictions; and (2) that the state court's comment at sentencing indicating its awareness that all three defendants had sought to plead guilty to manslaughter before trial reflected bias and partiality, justifying a new trial.

---

[8] As noted, although Shuford purports to join in any arguments made by his two co-defendants, only Medulla filed a § 2254 petition with any judge of this Court. In any case, the only issue raised by Calise on his direct appeal to the Appellate Division was the alleged suggestiveness of the lineup, which is precisely the same argument Shuford has raised here.

14

### a. Procedural Bar

In order for a federal court to review a state court decision that rests on an adequate and independent state procedural default, a petitioner must show both cause and prejudice or a fundamental miscarriage of justice. Fama v. Comm'r of Corr. Servs., 235 F.3d 804, 809 (2d Cir. 2000) (citing Coleman v. Thompson, 501 U.S. 722, 749-50 (1991)), and Harris v. Reed, 489 U.S. 255, 262 (1989). If the state court's reliance on state law is "clear from the face of the opinion," then federal review is procedurally barred. Id. (internal quotation marks and citations omitted). In Fama, the Second Circuit held that if the state court employs language such as "the defendant's remaining contentions are either unpreserved for appellate review or without merit", the claim is subject to federal review. Id. at 810-11. The court's decision in Fama did not overturn prior rulings, however, that a state court decision constitutes a procedural default where the court stated that a claim was "not preserved for appellate review" before ruling "in any event" on the merits. Id. at 810 n. 4.

### b. Legal Insufficiency Claim

The Appellate Division held that Shuford's legal insufficiency claim was unpreserved for appellate review because Shuford failed to object at trial as required under New York law, before ruling "in any event" that this claim lacked merit. Shuford, 303 A.D.2d at 771; CPL 470.05[2]. Thus, as the Appellate Division relied on an independent and adequate state procedural ground in denying relief on this claim, see Glenn v. Bartlett, 98 F.3d 721, 724-25 (2d Cir.1996), and, as petitioner has asserted neither any justifiable cause for his procedural default nor any resulting prejudice, his legal insufficiency claim is precluded from habeas review.

But, if it were preserved for habeas review, the Court would also find Shuford's legal insufficiency claim is without merit. Petitioners challenging the sufficiency of the evidence face

a "very heavy burden." Knapp v. Leonardo, 46 F.3d 170, 178 (2d Cir. 1995). To be granted habeas relief, Shuford must show that, "upon the record evidence adduced at the trial no rational trier of fact could have found proof of guilt beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 324 (1979). The court must defer to the fact finder's "assessment of the weight of the evidence and the credibility of witnesses[.]" Maldonado v. Scully, 86 F.3d 32, 35 (2d Cir. 1996).

The evidence against Shuford was clearly sufficient to convict him of the manslaughter and weapons possession charges. The evidence summarized above clearly demonstrated that Shuford and the other two defendants possessed dangerous instruments, beat the victim DeFazio with those instruments intending to cause serious physical injury, and that DeFazio died as a result of the beating. As noted, Kowalik recognized Shuford as "Mike," whom he knew through Petrano and Rizzo, when the three defendants first arrived at Kowalik's house and Shuford rushed him, and then again when they returned and attacked DeFazio. Kowalik watched Shuford arm himself with a stick or bat taken from the trunk of the car and, together with the other defendants, beat DeFazio to the ground with the weapons. Moreover, Krinitskiy and Dolan confirmed that they saw three men surrounding DeFazio, beating him with sticks. The medical examiner's report demonstrated that DeFazio died as a result of blunt impact to the torso. Kowalik positively identified Shuford at the lineup and again in court. Although Krinitskiy was unable to positively identify Shuford, he did describe Shuford as looking like the one with the stick or bat that had a ball on the end. Shuford did not testify in his own defense, and introduced no evidence to counter the eyewitness accounts of his involvement. Having considered this evidence in the light most favorable to the prosecution, the Court cannot conclude that no rational trier of fact could have found proof of guilt beyond a reasonable doubt. See Jackson,

443 U.S. at 324; Maldonado, 86 F.3d at 35. Accordingly, habeas relief is not warranted on this claim.

### c. Judicial Bias Claim

Shuford also joins in Medulla's judicial bias claim, asserting the trial court's comment at sentencing that "as far as I can tell, all three [defendants] sought to enter pleas of guilty to manslaughter" reflected bias and partiality necessitating a new trial. Although the Appellate Division did not address this claim specifically, its determination that Shuford's "remaining contentions are either unpreserved for appellate review or without merit" purportedly also included this claim, which Shuford also attempted to raise on appeal by joining in the arguments made by his co-defendants. See Shuford, 303 A.D.2d at 771. Where, as here, there is some uncertainty about whether the Appellate Division rejected a claim on the merits or on procedural grounds, the claim is not procedurally barred and is subject to federal review. Fama, 235 F.3d at 809-10.

Therefore, moving directly to the merits, the Court holds there is no basis to conclude that the Appellate Division's denial of Shuford's judicial bias claim was contrary to clearly established Supreme Court precedent, as required for a reversal under the AEDPA standard of review. As Judge Allyne R. Ross opined in dismissing co-defendant Medulla's petition, see Medulla, *supra* note 1 at 9, the standard for a judicial bias finding is set in United States v. Liteky, 510 U.S. 540 (1994). In that case, the Court stated that "opinions formed by the judge on the basis of facts introduced or events occurring in the course of the current proceedings, or of prior proceedings, do not constitute a basis for a bias or partiality motion unless they display a deep-seated favoritism or antagonism that would make fair judgment impossible." Id. at 555; see also Aetna Life Ins. Co. v. Lavoie, 475 U.S. 813, 821 (1986) ("only in the most extreme cases

would disqualification on [the] basis [of allegations of bias or prejudice by a judge] be constitutionally required."). Here, in line with Judge Ross's decision in Medulla, the Court finds that the trial court's lone statement regarding the defendants' attempted pleas is insufficient to establish bias or partiality of any kind violating Shuford's due process rights. Indeed, there is no evidence whatsoever in the record that the trial court considered the attempted plea in reaching its verdict or displayed a deep-seated favoritism or antagonism that would make fair judgment impossible. See Medulla, *supra* note 1 at 10. Accordingly, having reached the merits on this point and finding none, habeas relief on the ground of judicial bias or partiality is denied.

## CONCLUSION

For the reasons set forth above, Michael Shuford's motion for a writ of habeas corpus is denied and his petition is dismissed. Because Shuford has not made a substantial showing of a denial of a constitutional right, a certificate of appealability shall not issue with respect to any of Shuford's claims. 28 U.S.C. § 2253(c)(2). Additionally, the Court certifies pursuant to 28 U.S.C. § 1915(a) that any appeal from this Memorandum and Order would not be taken in good faith and therefore *in forma pauperis* is denied for the purpose of any appeal. See Coppedge v. United States, 369 U.S. 438, 444-45 (1962).

The Clerk of the Court is directed to close this case.

SO ORDERED.

Dated: Brooklyn, New York
September 3, 2008

ERIC N. VITALIANO
United States District Judge